ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| TERESA DÍAZ SANABRIA<br><br>Recurrente<br><br>v.<br><br>IP SUCCESS CORP. HNC BELLÍSIMA C&F / HERMETISE<br><br>Recurrido | KLRA202500237 | *REVISIÓN ADMINISTRATIVA* procedente de DACO, Oficina Regional de San Juan<br><br>Querella Número: SAN-2024-0018356<br><br>Sobre:<br>Ley Núm. 5 de 23 de abril de 1973 (Ley Orgánica de DACO) |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Candelaria Rosa y la Jueza Díaz Rivera.

Grana Martínez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de noviembre de 2025.

La recurrente, señora Teresa Díaz Sanabria solicita que revisemos la Resolución en la que el Departamento de Asuntos del Consumidor (DACo) declaró No Ha Lugar la querella presentada por esta contra IP Sucess Corp., h/n/c Bellisima C&F/Hermetise Bellisima C&F. Por su parte, la parte recurrida no presentó alegato en oposición a pesar de haberse concedido un término. Los hechos pertinentes que anteceden a la presentación de este recurso son los siguientes.

**I**

Conforme surge del expediente ante nuestra consideración el 27 de marzo de 2024 la recurrente presentó una querella enmendada en DACo contra la recurrida. La querella incluyó las alegaciones siguientes. La querellante tiene 77 años. La querellada le vendió a la querellante mediante engaño y maquinaciones insidiosas aproximadamente $23,813.00 en productos de belleza y los facturó a sus tarjetas de crédito. Desde el mes de noviembre de

Número Identificador

SEN2025_____

2023, la querellante ha intentado devolver los productos a la querellada por motivos de salud. La querellada se ha negado a aceptar la devolución. Por el contrario, le ha vendido más productos, mediante engaño y maquinaciones insidiosas y casi de forma obligatoria. La querellada nunca le explicó con detenimiento a la querellante sobre la política de devolución. Tampoco se comunicó con la querellante para informarle su determinación sobre la devolución del dinero. Durante meses la querellante reclamó a la recurrida por la devolución de los productos y el reembolso del dinero, debido a que por orden médica no podía utilizarlos. La devolución también obedeció a las cantidades exorbitantes cobradas.[1]

La querellante pidió a DACo que tomara conocimiento de todas las querellas y las noticias en la prensa sobre el patrón de engaño de la querellada contra los envejecientes. Según la querellante, la querellada tiene un patrón de engaño a los clientes envejecientes y los atrae a la tienda para apropiarse de su dinero. La querellante alegó que no había sido la primera víctima. Su representación legal solicitó; (1) la devolución de $23,813.00 más los intereses cobrados a las tarjetas de crédito, (2) aceptar la devolución de todos los productos que están sin utilizar, (3) indemnizar a la querellante con una cantidad no menor de $10,000.00 por daños emocionales y económicos, (4) el pago de una cantidad no menor de $5,000.00 por las costas y honorarios de abogado y, (5) la notificación de los hechos al Departamento de la Familia, la Oficina del Procurador de las Personas de Edad Avanzada y el Negociado de la Policía de Puerto Rico.[2]

Por su parte, la querellada negó las alegaciones de la querellante. Su representación legal argumentó que; (1) la

---

[1] Véase Anejo 4, Querella Enmendada, páginas 22 a 25 del apéndice del recurso.
[2] Id.

querellante asumió participar en una relación comercial con conocimiento voluntad y aceptación de sus actos, (2) la política de devolución establece claramente que no se devuelve el dinero y, (3) la querellante durante seis meses fue periódicamente a recibir tratamiento de forma voluntaria.[3]

Ambas partes comparecieron a la vista administrativa con sus abogados. La querellante prestó su testimonio. La Oficial Examinadora determinó los hechos siguientes. El 5 de julio de 2023, un empleado de la querellada intervino con la querellante, le entregó una muestra y la invitó al interior del establecimiento para probar los productos. La querellante accedió a entrar por curiosidad. La querellada le aplicó una crema en los parpados que le redujo casi inmediatamente la hinchazón de los parpados. La querellante adquirió una ampolleta y una máquina para dar masajes y pagó $57.50 con una tarjeta de débito. Además, adquirió un paquete de mascarillas y masajes por $ 4,348.49 e hizo el pago con una tarjeta de débito. El recibo de compra contenía las advertencias de que no se devolvía el dinero, no se acreditaba lo pagado a la tarjeta y solamente existía el derecho a recibir un crédito en la tienda, dentro de los catorce días disponibles para el cambio de la mercancía.[4]

La Oficial Examinadora, también determinó los hechos a continuación. La querellante acudió nuevamente a la tienda el 8 de septiembre de 2023, hizo un *layaway* de un combo de mascarillas de Vitamina C y *Ivory Red Facial Technology*. Por esas compras pagó $1,500.00, de esa cantidad pagó $400.00 con tarjeta de débito, $300.00 mediante tarjeta de débito y $800.00 mediante tarjeta de crédito. La política de *layaway* estaba explicada en el recibo de

---

[3] Véase Anejo 5, Contestación a la Querella Enmendada Querella Enmendada, páginas 26 a 28 del apéndice del recurso.

[4] Véase Anejo I, Resolución, Determinaciones de Hecho 1 a 6, página 1, apéndice del recurso.

compra. Según consta en el recibo No se podrá cambiar ni retirar parte de mercancía de un *layaway*. La fecha límite para pagar *layaway* es de 60 días a partir de depósito inicial. No se devolverá dinero por mercancía no retirada al finalizar el término de los 60 días. No se devuelve dinero en cash, tarjeta de crédito, ATH, solo crédito a la tienda utilizando el mismo día de cambio por el mismo departamento (cosmético por cosmético -perfume por perfume).[5]

Por último, constan en la resolución de la agencia los hechos a continuación. La recurrente acudió nuevamente a la tienda el 13 de noviembre de 2023 y adquirió varios tratamientos para el contorno de los ojos, pliegues naso labiales, frente y líneas de expresión. La compra ascendió a $8,239.85. La querellante pagó $7,722.62 con tarjeta de débito y $517.00 con tarjeta de crédito. El 27 de noviembre de 2023 la querellante solicitó el reembolso de las compras realizadas el 5 de julio de 2023 y el 13 de noviembre de 2023. La querellante alegó que tenía operado ambos ojos, debido a que sufría de cataratas. La solicitud fue por las cantidades de $557.50, $4,348.49 y $8,239.85. El 15 de diciembre de 2023 la querellante acudió nuevamente a la tienda y adquirió un paquete de faciales valorado en $1,615.75. El 16 de febrero de 2024, la querellante acudió a la tienda y adquirió un *Ivory Machine* y secciones de tratamiento para los pliegos naso labiales, *submental* y cuello, por lo que pagó $5,017.50 con una tarjeta de débito. El 29 de febrero de 2024 pidió el reembolso de los $5,017.50 de la compra que realizó el 13 de febrero de 2024. Todos los recibos de compra contenían la política de devolución de la querellada. Según consta en el recibo la querellada no devolvía el dinero, ni otorgaba créditos a la tarjeta. Únicamente concedía un crédito a la tienda,

---

[5] Véase Anejo I, Resolución, Determinación de Hecho 7, página 2, apéndice del recurso.

utilizado el mismo día del cambio, solicitado dentro de los catorce días disponibles y cambiando por el mismo departamento.[6]

La agencia concluyó que las partes consumaron un contrato de servicios y de compraventa mediante el que la querellante adquirió de la querellada productos estéticos antiarrugas y para el mantenimiento de la piel y el servicio de faciales. DACo resolvió que la querellada demostró que no fue negligente en el cumplimiento de sus obligaciones contractuales. La agencia determinó que la querellante asumió participar en la relación comercial con conocimiento, voluntad y aceptación de sus actos. Según el foro recurrido la querellante acudió voluntariamente en varias ocasiones al negocio de la querellada y adquirió los productos libre y voluntariamente. La prueba presentada convenció a la agencia de que la querellada le entregó a la querellante copia de la orden de compra y que la firmó porque estaba conforme. Por último, concluyó que la querellada estableció claramente en su política de devolución que no devolvía dinero a sus clientes y que solo podían reclamar un crédito a la tienda dentro de catorce días y por artículos del mismo departamento.[7]

Inconforme la recurrente presentó este recurso en el que alega que:

> ERRÓ LA AGENCIA ADMINISTRATIVA, EL DACO, AL NO ACOGER LA QUERELLA Y QUERELLA ENMENDADA PRESENTADA POR TERESA DÍAZ SANABRIA, SIN CONSIDERAR QUE LA PARTE RECURRIDA NO POSEE UNA POLÍTICA CORPORATIVA CLARA SOBRE DEVOLUCIÓN DE MERCANCÍA.

## LA REVISIÓN JUDICIAL DE LAS DE LAS RESOLUCIONES ADMINISTRATIVAS

La sección 4.5 de la Ley núm. 38-2017, 3 LPRA sec. 9675 limita la revisión judicial a; (1) que el remedio concedido por la

---

[6] Véase Anejo I, Resolución, Determinaciones de Hecho 8 a 15, página 2, apéndice del recurso.
[7] Véase Anejo I, Resolución, páginas 4 a 5, apéndice del recurso.

agencia sea el apropiado, (2) que la revisión de las determinaciones de hecho sea conforme al criterio de evidencia sustancial y, (3) determinar si las conclusiones de derecho fueron correctas mediante su revisión completa y absoluta. La evidencia sustancial es aquella pertinente que una mente razonable puede aceptar como adecuada para sostener una conclusión. No obstante, esta acepción no podrá estar sostenida por un ligero destello de evidencia o simples inferencias. El criterio rector siempre estará guiado por la razonabilidad de la determinación de la agencia, luego de considerar el expediente administrativo en su totalidad. *OEG v. Martinez Giraud,* 210 DPR 79, 90 (2022).

La parte que alega que la decisión de la agencia no está basada en evidencia sustancial, tiene que demostrar que en el expediente existe otra prueba que reduce o menoscaba el valor probatorio de la impugnada. Dicha parte tiene que demostrar que la agencia no resolvió de forma razonable considerando la totalidad de la prueba ante su consideración. El tribunal respetará las determinaciones de hecho del foro administrativo, si la parte afectada no demuestra la existencia de otra prueba que establezca que su decisión no está basada en evidencia sustancial o que reduzca o menoscabe el valor probatorio de la impugnada. *Domínguez v. Caguas Expressway Motors, Inc.,* 148 DPR 387-398 (1999).

El Tribunal Supremo de Puerto Rico adoptó en *Vázquez v. Consejo de Titulares,* 2025 TSPR 56, 215 DPR ____ (2025), la norma establecida por el Tribunal Supremo de Estados Unidos en *Loper Bright Enterprises v. Raimondo,* 603 U.S. ____ (2024), 144 S.Ct. 2244, 219 L. Ed 2d 832 (2024) sobre la revisión de las determinaciones de derecho de los organismos administrativos. Nuestro más alto foro judicial local reconoció la obligación de los jueces de cumplir cabalmente con el mandato legislativo de revisar las actuaciones administrativas. Fue enfático en que el legislador

dispuso expresamente que los tribunales están obligados a revisar las conclusiones de derecho de las agencias en todos sus aspectos. El tribunal hizo hincapié que el texto de la ley no deja duda alguna de que el legislador quiso eliminar la deferencia a las conclusiones de derecho de las agencias, para que la rama judicial cumpliera con el objetivo para la que fue creada, de adjudicar las controversias.

Por otro lado, el tribunal reconoció que la determinación del Tribunal Supremo de Estados Unidos era altamente persuasiva, porque nuestra legislación de derecho administrativo se creó inspirada en la *Administrative Procedure Act (APA)*,5 U.S.C. 551 et seg. La decisión advierte que el Tribunal Supremo de Estados Unidos resolvió que la deferencia concedida a las agencias era contraria al mandato congresional que la legislación depositaba en las cortes a los efectos de descargar su responsabilidad de interpretar la ley. Según el tribunal, la determinación del foro federal se fundamentó en que: (1) la norma de la deferencia iba en contra de los principios que cimentaban el poder judicial, (2) al igual que en la LPAU el legislador confirió al poder judicial la facultad de decidir todos los asuntos relevantes a la ley, (3) la APA no establece ninguna regla de deferencia que los tribunales deban aplicar a la hora de atender esas cuestiones de derecho y, (4) los tribunales deben ejercer un juicio independiente al determinar el significado de las disposiciones estatutarias. *Vázquez v. Consejo de Titulares,* supra.

No obstante, el Tribunal Supremo de Puerto Rico enfatizó que el foro judicial puede usar las interpretaciones de las agencias como una guía, debido a su acervo de experiencias y criterios informados. Sin embargo, fue enfático que eso no significa avalar ciegamente todas sus determinaciones, como en el pasado. El Tribunal Supremo de Puerto Rico acogió las expresiones del Tribunal Supremo de Estados Unidos, de que el relegar a las agencias la interpretación de

las leyes desafía el mandato legislativo que responsabiliza al foro juridicial de adjudicar todas las cuestiones de derecho. Por último, concluyó que, los tribunales deben ejercer un juicio independiente al momento de evaluar, si una agencia actuó dentro del marco de sus facultades estatutarias. Además, de que contrario al pasado, no tienen que honrar deferencia a la interpretación que hacen las agencias de una ley ambigua. *Vázquez v. Consejo de Titulares,* supra.

### DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR

El Departamento de Asuntos del Consumidor es el organismo administrativo cuyo principal propósito es defender, vindicar, e implementar los derechos de los consumidores en nuestra jurisdicción. La agencia es la encargada de aplicar las leyes que asisten los reclamos del consumidor. Art. 3 de la Ley Orgánica del Departamento del Consumidor. 3 LPRA 341 (b).

La reglamentación de la agencia autoriza al oficial examinador, el juez administrativo, el secretario y el panel de jueces del DACo a tomar conocimiento administrativo a iniciativa propia o a solicitud de parte. Estos funcionarios podrán tomar conocimiento sobre hechos o circunstancias de interés público conocidas por todas las personas bien informadas. Igualmente podrá tomar conocimiento sobre hechos susceptibles de determinación inmediata y exacta, mediante fuentes cuya exactitud no puede cuestionarse razonablemente. Regla 20.5 del Reglamento de Procedimientos Adjudicativos, Reglamento Núm. 8034 de 13 de junio de 2011.

### CONOCIMIENTO JUDICIAL

Las reglas de evidencia no aplican a las vistas administrativas. Sin embargo, los principios fundamentales se podrán utilizar para lograr una solución justa, rápida y económica. El funcionario que presida la vista podrá tomar conocimiento oficial de todo aquello que

pudiera ser objeto de conocimiento judicial en los tribunales de justicia. Sección 3.13 de la Ley núm. 38-2017, supra, 3 LPRA secciones 9653 (d) y (e). El conocimiento judicial es un medio de prueba, mediante el que se establece un hecho como cierto, sin la necesidad formal de presentar evidencia. El tomar conocimiento judicial de un hecho adjudicativo, significa aceptarlo como cierto sin necesidad de que el obligado evidencie su veracidad. El tribunal presumirá que es un asunto tan notorio que no será disputado. No obstante, la parte contraria no está impedida de ofrecer prueba en contrario. *U.P.R. v. Laborde Torres y otros I,* 180 DPR 253, 276-277 (2010).

La regla 201 de Evidencia, 32 LPRA Ap. VI, contiene los criterios para tomar conocimiento judicial sobre hechos adjudicativos. Así dispone que: el tribunal podrá tomar conocimiento judicial sobre hechos adjudicativos que no están en controversia, por qué; (1) son de conocimiento general dentro de la jurisdicción territorial del tribunal y, (2) susceptible de corroboración inmediata y exacta mediante fuentes cuya exactitud no puede ser razonablemente cuestionada. El tribunal podrá tomar conocimiento judicial a iniciativa propia. También podrá hacerlo a solicitud de parte, si esta provee información suficiente para ello. No obstante, no basta con que sea un hecho sea notorio o indubitable, también tiene que ser pertinente y admisible en evidencia. *U.P.R. v. Laborde Torres y otros I,* supra, págs. 277-279. Las partes tendrán derecho a ser oídas si procede el conocimiento judicial. La parte afectada podrá solicitar ser escuchada, luego de tomado el conocimiento judicial. En cuanto al momento apropiado, el tribunal podrá tomar conocimiento judicial en cualquier etapa de los procedimientos, incluyendo la apelativa. Regla 201 (d) y (e) de Evidencia, *supra.*

Por otro lado, el conocimiento judicial puede ser permisible o mandatorio. El conocimiento judicial es permisible, cuando se cumplen los criterios de conocimiento general y determinación exacta e inmediata, independientemente de que alguna de las partes lo solicite. Por el contrario, el mandatorio cuando la parte que lo solicita pone al tribunal en condiciones de hacerlo. *Asoc. de Periodistas v. González,* 127 DPR 704, 713 -714 (1991).

Los tribunales podrán tomar conocimiento judicial de los récords o autos de los casos radicados ante los tribunales, incluyendo los procedimientos de otra causa, que abarcan la resolución o sentencia que dispuso del mismo. La presentación de evidencia formal al respecto es innecesaria, porque son hechos que pueden comprobarse o determinarse de forma exacta e inmediata, ya que solo hay que acudir a la secretaria del tribunal en cuestión. *Asoc. de Periodistas v. González, supra, págs.* 714-715.

### LA DOCTRINA GENERAL DE LOS CONTRATOS

El contrato es el negocio jurídico bilateral mediante el cual dos o más partes expresan su consentimiento, conforme a la ley para crear, regular, modificar o extinguir obligaciones. Artículo 1230 del Código Civil de 2020, 31 LPRA sección 9751. Las partes pueden pactar cualquier cláusula, siempre que no sea contraria a la ley, la moral o el orden público. Artículo 1232, 31 LPRA sección 9753. Los contratos son la ley entre las partes, sus sucesores y terceros de acuerdo con la ley. Artículo 1233, 31 LPRA sección 9754. El perfeccionamiento de un contrato ocurre desde que las partes manifiestan su consentimiento sobre el objeto y la causa, salvo que sea necesario el cumplimiento de una formalidad o condición suspensiva. Artículo 1237, 31 LPRA sección 9772. No obstante, un negocio jurídico es anulable, si medio un vicio de voluntad que fue determinante para su otorgamiento. Los vicios de la voluntad son el error, el dolo, la violencia y la intimidación. El causante de los vicios

del consentimiento está sujeto a la indemnización de los daños y perjuicios resultantes. La carga de probar la existencia del vicio y de su carácter es de quien lo alega. Artículos 285-286 del Código Civil, 31 LPRA secciones 6191 y 6192.

El dolo ocurre cuando una parte es inducida a celebrar un contrato mediante maquinaciones insidiosas, e implica todo un complejo de malas artes, contrario a la honestidad e idóneo para sorprender la buena fe ajena, generalmente para beneficio propio. Su artífice ha previsto, querido el acto y está consciente de sus consecuencias antijuridicas y de que es injusto. *Colón v. Promo Motor Imports, Inc.,* 144 DPR 659, 666-667 (1997). El dolo grave recae sobre los elementos esenciales del contrato y determina el consentimiento. Al momento de evaluar, si se cometió un dolo grave que vicio el consentimiento tiene que considerarse la preparación académica, la condición social y económica y las relaciones y tipo de negocio en el que se ocupa la persona que lo alega. *Citibank v. Dependable Ins. Co. Inc.,*121 DPR 503, 518-519 (1998).

## CONTRATO DE ADHESIÓN

El contrato de adhesión es aquel en el que el aceptante esta precisado a aceptar un contenido predispuesto. Sus cláusulas se interpretarán de forma desfavorable a la persona que las redacto y a favor de la parte que se vio precisada a aceptar su contenido. Artículo 1248, 31 LPRA sección 9801. Las cláusulas esencialmente anulables por abusivas incluyen aquellas que no están redactadas de manera clara, completa y fácilmente legible. Artículo 1249 (a) 31 LPRA sección 9803 (a).

## LEYES QUE COBIJAN A LAS PERSONAS DE EDAD AVANZADA

El legislador protegió a nuestros envejecientes mediante legislación especial. La Carta de Derecho y la Política Pública del

Gobierno a favor de Adultos Mayores. Ley Núm. 121- 2019, según enmendada, contiene la política pública que promueve el valor, integración y el respecto del adulto mayor en nuestra sociedad. Su propósito es proteger la salud, física o mental y la propiedad del adulto mayor, contra amenazas, hostigamiento, coacción o perturbación por parte de cualquier persona natural o jurídica. 8 LPRA sec. 1512(5). La Carta de Derechos reconoce expresamente el derecho de los adultos mayores de vivir libre de presiones, coacciones y manipulaciones y familiares, personas particulares, empresas privadas o el Estado, cuya intención sea explotarlos financieramente o menoscabar su capacidad y derecho a auto determinación. 8 LPRA sección 1514 (24). La persona de edad avanzada se define como toda aquella de 60 años o más. 8 LPRA sección 1513(5). La coacción se define como fuerza o violencia física o psicológica empleada contra una persona para obligarla a que exprese o haga alguna acción u omisión. 8 LPRA sec. 1513 (11). La influencia indebida ocurre cuando existe una relación de poder, en la que el adulto mayor permite que un tercero actúe en su nombre, pese a la evidencia del perjuicio que le produce dicha actuación. Igualmente ocurre, cuando el adulto mayor procede de forma diferente a como lo haría en ausencia de la influencia del otro. 8 LPRA sección 1513(24).

De otra parte y también en protección del adulto mayor, la ley 76-2020, Ley Especial para Prevenir la Explotación Financiera contra los Adultos Mayores y Adultos con Impedimentos contiene la política pública del Gobierno de Puerto Rico en protección de esa población. Esta legislación protege a los adultos mayores y con impedimentos de la explotación financiera definida en la Ley 121-201 como el uso impropio de los fondos, la propiedad, o los recursos de un adulto mayor por otra persona. La protección se extiende, pero no se limita a fraude, falsas

pretensiones, malversaciones de fondos, conspiración, falsificación de documentos, expedientes o récords, coacción, transferencia de propiedad, o negación de acceso a bienes. 8 LPRA 1572. La ley incluye como indicadores de explotación financiera los retiros o débitos irregulares o atípicos de cuentas de banco, retiros incompatibles con los medios económicos de la persona de edad avanzada y transacciones electrónicas no autorizadas. 8 LPRA sección 1573.

### REGLAMENTO DE PRÁCTICAS COMERCIALES DEL DACO, REGLAMENTO NÚM. 9158 DE 6 DE FEBRERO DE 2020

Conforme la regla 3 del Reglamento Núm. 9158, *supra,* este debe interpretarse liberalmente a favor del consumidor. Según lo dispuesto en la regla 6(c) toda cualificación y descripción de un producto debe ser suficiente clara, prominente y entendible, para evitar engaños o falsas percepciones en el consumidor. La regla 9 contiene la política de devolución de bienes. A tales efectos dispone que los comercios deben exponer rótulos visibles notificando e informando al consumidor clara y adecuadamente la política de devolución. El rótulo debe incluir la forma en que se realizará la devolución y el término que tiene el consumidor para realizarla. El comerciante no puede negarse a la devolución del precio pagado, si el bien vendido tiene algún defecto, no cumple con las representaciones divulgadas que motivaron al consumidor a adquirirlo, no sirve para el propósito que fue adquirido y se incumple con este reglamento durante la contratación o la vigencia de la garantía. En otro orden de cosas, el Capítulo Número II provee las directrices que los comerciantes deben seguir para evitar las prácticas y anuncios engañosos. Su objetivo es proteger al consumidor y promover la confianza en las transacciones comerciales. Regla Número 11. Las practicas engañosas que están expresamente prohibidas incluyen: representar o expresar un

hecho o una oferta, si tal declaración es engañosa o falsa, posee la tendencia o capacidad para confundir, no tiene información suficiente para sustentarla, o se ocultare un dato relevante. Regla Núm. 14 (b) (2).

Las aseveraciones generales están incluidas como practicas engañosas debido a su falta de especificidad. Id. Por su parte, la Regla 16 establece que todo comerciante está obligado a divulgar clara y adecuadamente los datos relevantes de un producto o servicio, antes de efectuar la venta u ofrecimiento de venta de este. La divulgación deberá ser libre de ambigüedad que puedan confundir al consumidor. Las especificaciones incluirán componentes, características, siempre que por la naturaleza del bien o servicio que se anuncien o se ofrezca en venta sea necesario conocer esta información. Regla Núm. 16 (K).

### III

La recurrente tiene razón. DACo exoneró erróneamente a la recurrida de responsabilidad. La agencia se equivocó al concluir que la recurrente asumió participar de la relación comercial con conocimiento, voluntad y aceptación de sus actos. Los Acuerdos de Compra son contratos de adhesión, preparados unilateralmente por la querellada. Sus cláusulas deben interpretarse a favor de la recurrida, porque no están claras y son ambiguas. El documento contiene una cláusula ACLARACION DE DETALLES Y CONCIENCIA DE LA COMPRA, cuyo propósito es proporcionar una descripción detallada de los productos y tratamientos adquiridos por el cliente, garantizar su compresión y la transparencia. El vendedor hizo constar que la firma del cliente manifestaba su pleno conocimiento y acuerdo con la adquisición de los productos, servicios y los precios especificados. No obstante, no es cierto que esa descripción detallada del producto consta en el acuerdo. Tampoco existe evidencia de que la recurrida ofreció esa información verbalmente a

la recurrente. La recurrida no incluyó en el acuerdo una cualificación y descripción clara, adecuada, entendible y detallada prominente de los productos y servicios de belleza por los que cobró miles de dólares a la recurrente. La señora Díaz Sanabria declaró que nunca le explicaron para que se usaban los productos, si eran para la cara o el cuello. Fue enfática en que nunca le explicaron nada y que solo querían vender por vender.[8] La descripción incluida en el acuerdo es generalizada y carece de especificidad, porque se omitieron los datos relevantes del producto. La descripción se limitó al nombre y cantidad de productos o servicios ofrecidos. Por esa razón, concluimos que la práctica de la recurrida de hacer constar en el acuerdo que proveyó al cliente una descripción detallada de los productos es engañosa.

Según la Descripción de Productos y Servicios del Acuerdo de Compra del 8 de septiembre de 2023, la querellante adquirió dos productos y dos servicios, que se describen como Red, vitamina C y regalo. El precio de la compra fue mil quinientos dólares, pagados por débito. Las partes suscribieron otro Acuerdo de Compra en el que consta que la recurrente adquirió un producto y doce servicios. La compra se describe como Maleta Hermitise, 4 ojos, 4 cuello, 4 naso labial, 4 frente y líneas de expresión, una sección de micro agujas. El costo fue de $ 8,239.85 y fue pagado con una tarjeta visa.  El 16 de febrero de 2024 la querellante compró un producto y ocho servicios 4 vst nasolabial y 4 vst submenton. Por esa compra pagó $5,017.50 de una tarjeta.[9]

La recurrida incumplió la política de devolución, porque no tenía visible el letrero que publica dicha política. Su defensa siempre ha sido que en el Acuerdo de Compra consta su política de devolución y se advierte que no existe el reembolso de dinero. La

---

[8] Véase Transcripción de la Prueba Oral (TPO), página 62 y 63.
[9] Véase Anejo 10 del apéndice del recurso.

reglamentación aplicable exige a los establecimientos comerciales exponer rótulos en lugares visibles con letras claras y legibles, informando al consumidor de forma clara y adecuada la política de devolución. El comerciante no podrá negarse a devolver el precio pagado por el consumidor, si ha incumplido con las disposiciones reglamentarias. Este tribunal tomó conocimiento judicial del incumplimiento de la recurrida con el Reglamento de Prácticas Comerciales en su tienda ubicada en Plaza Caribe Mall de Ponce. DACo le impuso el pago de una multa administrativa de mil dólares. La recurrida fue multada, debido a que no anunció de forma clara y adecuada el precio de sus productos. Véase, Caso Núm. RPC -2023-0056309.

La agencia falló al no ejercer la facultad que le proveer su ley habilitadora de tomar conocimiento administrativo sobre las querellas y casos presentados por adultos mayores contra la recurrida. Este tribunal toma conocimiento judicial de la Querella Núm. PON 2022-0003179 presentada por la señora Lilliam Santiago Ramírez, una persona de 68 años a la que los empleados de la recurrida le solicitaron sus tarjetas de crédito y le facturaron más de diez mil dólares. La querellante no verificó detenidamente los recibos de pago. Los vendedores tampoco le informaron verbalmente el precio de los productos. La querellante tuvo dificultad para utilizar los productos, porque no entendía las instrucciones. Las cremas le ocasionaron una reacción alérgica. La querellada se negó a cancelar la transacción. La querellante declaró que no hubiese comprado los productos recomendados por las empleadas, de haber conocido su precio. Además, declaró que en la tienda no había ningún letrero sobre la política de devolución y que ningún empleado le informó al respecto. DACo enfatizó que la querellante era una envejeciente de 68 años, protegida por ley, debido a su vulnerabilidad. La agencia dio credibilidad a su testimonio, declaró

ha lugar la querella y la nulidad del contrato, ordenó a la querellada a reembolsarle todo el dinero pagado y refirió el caso a la Unidad de Investigaciones Especiales del Departamento de la Familia, a la Oficina del Procurador de las Personas de Edad Avanzada y el Negociado de la Policía de PR. La agencia tuvo que acudir al TPI para hacer cumplir la resolución. El TPI ordenó su cumplimiento.

Otra de las querellas de las que tomamos conocimiento judicial, es la SAN 2023-0015847. Esta querella la presentó la señora Estela Clemente Clemente, una adulta mayor de setenta y tres años. La querellante acudió a la tienda en Plaza Las Américas, e indicó que estaba interesada en los productos. No obstante, enfatizó que su piel era muy sensible. La empleada le dijo que la posibilidad de reacción alérgica de sus productos era mínima. La querellante adquirió productos y tratamientos valorados en $2,230.00 y otros productos de estética valorados en $669.00. El recibo de compra especificaba que no se devolvía dinero, ni crédito a la tarjeta, que solo se concedía crédito a la tienda y que el término de cambio era catorce días. La querellante sufrió una erupción en la piel, luego del primer tratamiento. Durante el segundo tratamiento lo informó en la tienda. Los empleados le tomaron fotos y le sugirieron comprar otro producto valorado en $2,500.00. La querellante no aceptó. Posteriormente, presentó un certificado médico de que los productos le ocasionaron dermatitis. La querellante devolvió los productos herméticamente cerrados y solicitó la devolución del dinero. La querellada solo le ofreció un crédito en productos. DACo ordenó a la querellada devolver el dinero, porque la querellante no podía utilizar los productos para el propósito que los adquirió.

Además, tomamos conocimiento judicial del recurso KLRA202500085, cuyo origen está basado en la querella que presentó el señor Alfonso Rodríguez Ramírez contra la parte

recurrida. El querellante era una persona de 88 años a la que la recurrida le facturo $14,921.00. El octogenario entró a la tienda de Plaza Las Américas por equivocación, porque entendía que reparaban relojes. Un empleado le dijo que no arreglaban relojes, pero vendían productos de la piel y le ofreció unos para la cara. La querellada indagó tres tarjetas de crédito del querellante y le facturó $14,941.00. El querellante no autorizó las compras. Los recibos tienen tres firmas diferentes que no son del querellado. El señor Rodríguez solicitó el reembolso, porque no pidió ningún servicio. Además, advirtió que tenía una condición del corazón y que recibió una llamada de Costco en la que le dijeron que la compañía hacia fraude. El querellante no recibió respuesta de la querellada, a pesar de que en el recibo constaba que se iban a comunicar con el cliente entre 24 a 48 horas. DACo resolvió que el consentimiento del querellante estuvo viciado y que la querellada cometió dolo grave. La agencia determinó que el contrato era anulable y ordenó a la querellada a reembolsar al consumidor lo pagado y a indemnizarlo por daños y perjuicios y a pagar honorarios de abogado. La recurrida solicitó revisión a este tribunal. El recurso fue desestimado, por falta de jurisdicción.

Por último, tomamos conocimiento judicial del recurso KLRA202400494. La recurrida solicitó revisión de la resolución en la que DACo declaró ha lugar la querella de María C. Alcalá Rodríguez. La querellante es una persona de edad avanzada, que alegó que la querellada cometió fraude en su contra. Según la querellante, un empleado le ofreció un facial gratis, mientras caminaba frente a la tienda. Luego del facial, le mostraron unos productos que también eran gratis. No obstante, en su casa se dio cuenta que nada fue gratis y que le facturaron $11,150.00 a su tarjeta de crédito. Además, se percató de que todos los productos estaban abiertos. La querellada se negó a devolverle el dinero. DACo

concluyó que la querellante no comprendía que estaba comprando y que la querellada actuó dolosamente. El Tribunal de Apelaciones confirmó a la agencia, porque hizo un ejercicio razonable de la apreciación de la prueba y la credibilidad de la querellante.

El testimonio de que la recurrente nos merece entera credibilidad. La recurrente tiene 78 años. Según surge de su testimonio las empleadas de la recurrida siempre están en la puerta, dando unos sobrecitos de crema para la cara, e insistiendo para que entren a la tienda. El 5 de julio de 1923, una empleada le entregó un sobre con una crema, la llevó a la tienda y le puso unas cremas en los ojos. La empleada le vendió una especie de inyección que le baja la hinchazón.[10] Durante la vista se presentó un recibo por compras de $557.50 y otro de $4,346.49, correspondientes al 5 de julio de 2023. La recurrida cobro dos veces la compra de $557.50.[11] La recurrente dijo que fue unas diez veces a la tienda para solicitar la devolución. Sin embargo, no fue hasta el mes de diciembre que la recurrida hizo la devolución.[12]

La recurrente acudió por segunda ocasión a la tienda el 8 de septiembre de 2023. Según consta en el Acuerdo de Compra, ese día le cobraron $1,500,00. El pago se cargó a las tarjetas de Banco Popular y Sams Club.[13] La recurrente declaró que regresó por segunda ocasión, porque iban a darle unos faciales. Además, declaró que fue a devolver los productos que compró, porque no tenían nada marcado, ni siquiera el precio. Fue enfática en que su intención era devolver los productos, pero la recurrida nunca quiso aceptarlos.[14] No obstante, dijo que ese día hizo una compra de

[10] Véase páginas 9 a 10 de la TPO.
[11] Id, página 12 de la TPO.
[12] Id, página 20 de la TPO.
[13] Véase páginas 15 a 16 de la TPO.
[14] Id, página 19 de la TPO.

$1,672.[15] Durante el contrainterrogatorio reafirmó que no fue a la tienda en el mes de diciembre de 2023, a pesar de la insistencia del abogado de la recurrida.[16] Por el contrario, declaró categóricamente que no hizo ninguna compra en el mes de diciembre de 2023 y tampoco autorizó ninguna transacción.[17]

El abogado de la recurrida intentó establecer que la recurrente hizo las compras voluntariamente, porque firmó los recibos. La recurrente aceptó que los firmó y no los leyó. No obstante, explicó que fue presionada y engañada y que estaba confundida porque siempre estaban dándole y metiéndole productos.[18] Durante el redirecto dijo que casi no veía y que ni siquiera tenía las gafas para ver las letras pequeñas.[19] La Oficial Examinadora le cuestionó, porque no preguntó el precio de los productos. La recurrente contestó que no le daban tiempo a mirar nada, porque lo de ellos era traerles las cosas. Fue enfática en que, de haber sabido, no se hubiese metido en ese problema.[20] La recurrente dijo que le llevaban los productos y la presionaban para que les diera la tarjeta, e insistió en que la envolvieron.[21]

La Oficial Examinadora preguntó a la recurrente, cuándo se sintió engañada. La recurrente contestó que cuando se percató que no había usado ninguno de los productos, porque nunca le explicaron para que se usaban, sí para la cara o el cuello. Fue enfática en que nunca le explicaron nada y que solo querían vender por vender.[22] La recurrente le dijo a la Oficial Examinadora que se sintió presionada en todas las otras ocasiones que fue a la tienda, excepto la primera vez. No obstante, explicó que continúo yendo,

---

[15] Id, página 55 de la TPO.
[16] Id, página 58 de la TPO.
[17] Id, página 24 de la TPO.
[18] Id, página 59 de la TPO.
[19] Id, página 65 de la TPO.
[20] Véase página 61 de la TPO.
[21] Id, página 62 de la TPO.
[22] Id, páginas 62 y 63 de la TPO.

para que le aceptaran la devolución de los productos. La recurrente declaró que los empleados le decían que llevara los productos para enseñarla a utilizarlos.[23] La señora Díaz Sanabria dijo que solicitó la devolución dentro de los 14 días. Sin embargo, nunca la aceptaron, a pesar de que informó que por orden medica no podía utilizarlos porque tenía glaucoma. La recurrente insistió en que nunca la llamaron para contestarle sobre la devolución y que cuando ella llamaba, no la atendían. Por último, declaró que al final pudo hablar con el mánager. La persona que identificó como Leo, le ofreció un tratamiento con una maquina más avanzada, pero no lo aceptó.[24]

DACo erró al no declarar ha lugar la querella. La agencia tuvo evidencia sustancial más que suficiente para concluir que la recurrente fue víctima de un vergonzoso y repudiable patrón de abuso financiero por parte de la recurrida, idéntico al que ha cometido contra otras personas de la tercera de edad. La conducta de Bellísima atenta contra la política pública que cobija a los adultos mayores. La recurrida se aprovechó fraudulentamente de la vulnerabilidad de la recurrente y utilizó como carnada la entrega de muestras gratuitas para persuadirla a entrar a la tienda y facturar miles de dólares a sus tarjetas de crédito. Bellísima nunca le explicó a la recurrente detallada y claramente sobre el uso de los productos, ni le advirtió si existían casos en los que no podía utilizarse. La recurrente solicitó la devolución de su dinero, porque por orden médica no podía utilizar los productos. No obstante, la recurrida le dio largas a la devolución, y persuadió a la recurrente mediante trata y engaño para que comprara otros productos y así continuar facturando miles de dólares a sus tarjetas de crédito. Al igual que en los otros casos sobre los que tomamos conocimiento judicial, lo primero que hacían los empleados de la recurrida

---

[23] Id, página 64 de la TPO>
[24] Véase página 64 de la TPO.

era pedirles las tarjetas de crédito a las personas de la tercera edad. Por último, advertimos que la recurrente se negó a devolverle el dinero, a pesar de que no tenía visible en la tienda la política de devolución.

Bellísima violentó la política pública que cobija a los adultos mayores, porque explotó financieramente a la recurrente, mediante el retiro de miles de dólares con cargo a sus tarjetas de crédito. La conducta de Bellísima amerita que el caso sea referido a la Unidad de Investigaciones Especiales del Departamento de la Familia, a la Oficina del Procurador de las Personas de Edad Avanzada y el Negociado de la Policía de Puerto Rico.

**IV**

Se revoca la resolución recurrida, se declara ha lugar la querella y se devuelve el caso a la agencia para que determine y adjudique los daños y perjuicios.

Lo acordó y manda el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones